IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                  **REPORT AND RECOMMENDATION**

v.

                                  10-CR-360(A)(M)

DONALD R. GRIFFIN,

                Defendant.

_____

        Defendant Donald R. Griffin is charged in a Second Superseding Indictment [208][1] with violent crime in aid of racketeering arising from the July 5, 2010 home invasion robbery of Homer Marciniak, and with conspiracy to transport stolen merchandise in interstate and foreign commerce. This case was referred to me on December 7, 2010 by Hon. Richard J. Arcara for supervision of all pretrial proceedings.

        Before me is Griffin's motion to suppress statements made by him on October 28, 2010. [124], ¶¶12-17. An evidentiary hearing was held on November 4, 2011, January 25, 2012, and March 15, 2012 [222, 221, 205, 269], followed by the parties' post-hearing submissions [277-278]. Oral argument was held on September 27, 2012 [290]. For the following reasons, I recommend that the motion be denied.

**HEARING TESTIMONY**

        <u>Officer Salvatore Garafalo</u> - Officer Garafalo is employed by the Miami-Dade police department. He testified that in October 2010 he received a telephone call from New York State Police Investigator Christopher Weber asking for assistance in locating Griffin, who was

---

[1]     Bracketed references are to CM-ECF docket entries.

believed to be in the Miami area traveling with a carnival. Investigator Weber provided him with a New York State tag number for a camper (November 4, 2011 hearing transcript [222], pp. 4-5, 23). Weber learned where the carnival was being held and Officer Garafalo located the vehicle (id., pp. 5, 22-23).

Investigator Weber arrived in Miami on October 28, 2010, with New York State Police Investigators James Buono and Rick Landahl (id., pp. 5-6, 14, 23). After being briefed by Weber, Officer Garafalo had some police officers accompany them to the carnival, which was being held at a church (id., pp. 6, 23). A total of 12 officers responded (id., p. 25). Griffin was located inside a trailer at the carnival (id., pp. 6-7, 26).

Officer Garafalo and Investigator Weber identified themselves to Griffin in the parking lot and "Weber told [Griffin] why he was there, that he wanted to speak to him about a case that had occurred in the New York area" (id., p. 8). Weber and Garafalo were in plain clothes and showed him their credentials (id., pp. 8, 27-28). Garafalo testified that "the contact that we had with Mr. Griffin was very cordial, it was strictly conversational, there was no raising of voices, no threatening. It was pleasant conversation" (id., p. 8). He asked Griffin if he would accompany them to headquarters so that he could be interviewed, and he agreed to do so (id., pp. 9, 30-31). Griffin was then escorted to Garafalo's unmarked police car (id., pp. 9, 33), and was not handcuffed during this escort (id., p. 33).

Upon arriving at Garafalo's vehicle, Griffin was handcuffed and placed in the front passenger seat (id., pp. 9-10, 33, 46). Garafalo explained to him that "this was for his safety and [their] safety" (id., pp. 9-10). Weber was in the rear passenger seat (id., p. 10). It took approximately 10 minutes from the time they first encountered Griffin until he was brought to the

police car (id., p. 37), and another 30 minutes to travel from the church parking lot to the police department in Doral, Florida (id., pp. 10-11, 14, 35).[2] On the way, "[o]ther than . . . do you want something to eat or drink, are you okay", there was no conversation "out of the ordinary" or about the facts of the case (id., pp. 10-11).

When they arrived at the police department, Garafalo and Weber escorted Griffin, still in handcuffs, to the homicide office on the second floor (id., pp. 11, 35-36). He remained handcuffed until he was taken to an interview room, which was approximately 8' by 12' or 10' by 12' in size and had no windows (id., pp. 11, 36, 39).

On direct examination, Garafalo testified that Griffin remained alone in the interview room for "maybe five minutes" before he and Weber entered the room (id., p. 11), and that upon entering the room Weber advised defendant of his Miranda rights, but Garafalo could not recall the precise time this occurred (id., pp. 12, 37). Garafalo did not remain in the room for the interview (id., p. 12). However, on cross-examination Garafalo testified that Weber did not Mirandize Griffin until some time after he initially reentered the interview room:

> "Q.   . . . You indicated to us that at some point in time you reentered this room; is that correct?
>
> A.   That's correct.
>
> Q.   And that was after - some time after Mr. Griffin had been placed in the room initially, true?
>
> A.   That's correct.
>
> Q.   Then you left the room at that point, correct?

---

[2] He also testified that the trip took "[m]aybe between 20 and 30 minutes", but "no more than 30 minutes" ([222], p. 15).

>    A.    That is correct.
>
>    Q.    And then you reentered the room at a later time, and Investigator Weber is present in the room; is that correct?
>
>    A.    That is correct.
>
>    Q.    And your testimony is that while you're in the room, at that point Investigator Weber read Mr. Griffin some warnings?
>
>    A.    That is correct.
>
>    Q.    How long were you in the room for before you heard these warnings being given to Mr. Griffin?
>
>    A.    I don't recall . . ." (id., pp. 41-42).

Garafalo conceded that he did not know what occurred during the interval from when he left Griffin in the interview room until the time he reentered the room (id., p. 40). When Garafalo left the interview room after observing Griffin being Mirandized, he next observed Griffin being photographed by the crime scene investigators (id., p. 43), after he had provided his statement to Weber (id.). Garafalo transported defendant to the Dade County Jail at approximately 11:00 p.m. (id., p. 12).

Garafalo stated that although he took handwritten notes, he destroyed them (id., p. 16). However, he dictated a narrative report (gov. ex. 4 [298-3]) sometime in December or the beginning of January ([222], pp. 16-17). He conceded that his report mistakenly indicated that Weber arrived in Florida on October 26, 2010, rather than October 28, 2010 (id., p. 22). The report also did not indicate that defendant was Mirandized (id., p. 40).

<u>Investigator Christopher Weber</u> - Investigator Weber is employed by the New York State Police. He testified that in connection with the investigation of the July 5, 2010 home

invasion robbery of Homer Marciniak he took a statement (gov. ex. 8 [299-7]) from co-defendant Arlene Combs on October 14, 2010, and was aware that other investigators had taken statements from other suspects, including Terry Stewart (gov. ex. 6 [299-5]), Juan Javier (gov. ex. 7, [299-6]), and Trisha Sauerbier (gov. exs. 5A, 5B and 5C [299-2, 299-3, 299-4]) (January 25, 2012 hearing transcript [221], pp. 5-6).[3] He was familiar with the content of these statements before he traveled to Florida to interview Griffin (id., pp. 8, 11-14, 62-64, 72-73). Based upon his discussions with Investigators Buono and Landahl, they were also familiar with the statements of the other suspects before traveling to Florida (id., p. 16).

       Weber stated that they arrived at the church at "around" 4:00 p.m. and located Griffin within several minutes thereafter (id., p. 19). He identified himself, showed Griffin his credentials, advised him that he wanted to talk to him about an incident that took place in Medina, New York, and asked him if he would go back to the Miami-Dade Police Department for questioning (id., pp. 17-20, 47-48). The encounter was "cordial" (id., p. 20). Griffin "acknowledged that he understood what it was about" and agreed to go with him, but did not provide any information while at the church (id., pp. 18-20).

       Griffin was taken to Garafalo's vehicle at 4:15 p.m. ([221], pp. 57-58; gov. ex. 2 [298-2]). Like Garafalo, Weber testified that Griffin was handcuffed in the front seat of the patrol car and it took "[r]oughly 20 to 30 minutes" to travel from the church to the police

---

[3]    I permitted the statements to be entered into evidence subject to cross-examination and argument in the parties' post-hearing briefing as to what weight, if any, should be given to the statements ([221], p. 10).

department (id., pp. 20-21, 48).[4] During this ride Griffin was not asked any questions about the incident, there was just "small talk about Florida" (id., p. 57).

To the best of Weber's recollection, they arrived at the police department sometime between 4:35 and 4:45 p.m. (id., p. 59). Upon their arrival, they took Griffin to the locked interview room on the second floor, where his handcuffs were removed. He was offered food and water, which he declined (id., pp. 21-22, 59, 70). They then sat down and Weber "just began obtaining pedigree information from him at that time" (id., p. 21). He stated that "[O]nce I *Mirandized* him, I started taking his statement right away at that time" (id., p. 22). However, he conceded on cross-examination that this testimony was incorrect: "I believe the pedigree was taken *after* I read him his *Miranda*" rights (id., p. 50 (emphasis added)). Weber testified that the first thing he did when he sat down with Griffin in the interview room was to read him his Miranda rights using his Miranda card (id., pp. 56-57; gov. ex. 1 [298-1])[5], but he could not recall how many times he left the interview room before returning to read the Miranda rights (id., p. 70).[6] He claims that when asked whether he agreed to waive his rights, Griffin responded, "Yeah, I'll talk to you" (id., p. 24; gov. ex. 2 [298-2]). Weber stated that he Mirandized Griffin

---

[4]    On cross-examination, Investigator Weber testified that "it seemed . . . like it took at least half an hour to get back" ([221], p. 58).

[5]    It is Investigator Weber's customary practice is to advise a subject of their Miranda rights by reading directly from a "*Miranda* card that was issued in the academy" ([221], p. 22). He testified on direct examination that Government Exhibit 1 [298-1] was an accurate copy of the Miranda card he received at the academy and that it was the card that he read from when he Mirandized defendant (id., p. 22). However, on cross-examination, Investigator Weber conceded that the Miranda card (gov. ex. 1 [298-1]), which contained James Thompson's initials, was not his card ([221], p. 51). Nevertheless, he testified that other than for Thompson's initials, the content of the card was identical to his Miranda card (id., p. 72).

[6]    This contradicts his earlier testimony that he Mirandized defendant when they first entered the interview room ([221], pp. 56-57).

at 5:23 p.m. in Garafalo's presence. Gov. ex. 2 [298-2]. They had "arrived at the PD just prior to" Griffin being Mirandized ([221], p. 27).

Weber stated that "[o]nce Mr. Griffin was read his *Miranda* rights and I obtained the pedigree information from him, we began discussing the actual incident that's being investigated. And I had asked him . . . a couple of questions at the beginning regarding did he know who I was, why I was there, did he have his *Miranda* rights read to him. And once I got through most of that . . . , I just began a narrative story using his words regarding the incident . . . . [A]s I was asking him questions, he was answering and I was just writing . . . his narrative response in the body of the statement" (id., pp. 28-30). When the statement (gov. ex. 3 [299-1]) was complete, Weber "[h]ad him review [it], make any changes . . . , initial next to his *Miranda* warning again at the top of the statement, and sign the statement" ([221], p. 30). Griffin read the statement to himself and appeared to understand it (id., p. 30). The statement concluded at 8:12 p.m. Gov. ex. 3 [299-1].

The handwritten statement was prepared using a form that began with a preprinted Miranda rights and waiver. Weber "did not reread . . . the *Miranda* warning on the top of the statement"to Griffin - instead, he "had him read them at the completion of the statement before he signed . . . and initial[ed] that he read those" ([221], pp. 54). The statement also indicates that he was asked: "Did you have your Miranda rights read to you at 5:23 p.m . . . and also read the above Miranda rights . . .", which he answered affirmatively. Weber testified that Griffin "was read his Miranda rights at 5:23. When I began the written statement, I asked him a question if he was read his Miranda rights, which he acknowledged. At the completion of that statement, I advised him to read that and initial acknowledging that he read the Miranda rights a second time,

so they weren't actually read to him again by me. He was instructed to read them and initial next to each one on that statement form that he acknowledged each of them" (March 15, 2012 hearing transcript [269], p. 39). The statement (gov. ex. 3 [299-1]) also indicates that Investigator Weber asked, "Has anyone made any threats or promises to you regarding making this statement?", and that Griffin responded "No".

During the interview, Griffin was offered bathroom breaks, food and water ([221], pp. 27-28). Although Weber believed that he had the statements of the other suspects with him in a folder in the interview room, he did not recall displaying the statements to Griffin during the interview (id., p. 65). Weber also could not recall how many times Garafalo entered and exited the interview room, but did not believe that any other officers entered the room (id., p. 71).

At the time Weber obtained Griffin's statement, there was no warrant for his arrest (id., pp. 33-34). Co-defendant Albert Parsons was located at the carnival and brought back to the Miami-Dade Police Department, where he was questioned by Investigators Landahl and/or Buono and a statement was obtained (id., pp. 17, 34). Upon completion of Griffin's and Parsons' statements, Landahl "made the decision . . . to contact the D.A. in Orleans County and have one of our investigators on standby in Orleans County, attempt to obtain a arrest warrant for both of these individuals" (id., p. 34). Copies of Griffin's and Parsons' statements were faxed to New York State and they received a faxed copy of the arrest warrants issued in Orleans County (id., p. 34). At this point, both individuals were advised that they were under arrest and were taken to the holding center (id., p. 35).

Weber testified that in his unit, the Bureau of Criminal Investigation, they "as a day-to-day course of business . . . do not file police reports . . . . Generally, . . . we are used more

for the interviewing and for the logistics of major crimes.  So I personally do not do what we would call an SJS report or a police report" (id., pp. 38-39).  The New York State Police Major Crimes Unit was "essentially" assisting the Medina Police Department, who had sought their assistance with the investigation (id., pp. 39-40).  Consequently, he "never filed a formal police report on this case and . . . will never" (id., p. 39).

        Defendant Donald Griffin - Griffin testified that at the carnival his boss came to his room told him that someone was looking for him and asked him if he was "Pooh" (January 25, 2012 hearing transcript [205], pp. 3-4; March 15, 2012 hearing transcript [269], p. 7). When he came outside, he observed at least two police officers  ([205], p. 4; [269], p. 7) and Parsons handcuffed and being searched ([205], p. 5).  Weber told him that he needed to speak with him and "grabbed [his] arm and [they] walked toward the car" (id.).  As they walked toward the vehicle, Weber identified himself, showed him his credentials, and said that they needed to speak to him, but could not do so on the church grounds (id., pp. 5-6).  When they arrived at the vehicle, he was searched and told that it was for his own protection, then was handcuffed to the front seat belt (id., p. 6).  Griffin stated that he entered the vehicle at approximately 4:15 p.m. ([269], p. 9) and that it took "at least" 20 minutes to travel to the police department ([205], p. 7; [269], pp. 9-10).  He estimated that they arrived at approximately 4:35 p.m. ([269], p. 10).

        Griffin was immediately taken in handcuffs to the second floor interrogation room, where he was left alone for "[o]nly a minute or two, it wasn't long" ([205], p. 7; [269], pp. 10, 17, 29).  He could not recall whether he remained handcuffed ([269], p. 29).  When Weber returned to the interview room he "sternly" told him to sit up and asked him if he knew why he was brought to the police department ([205], p. 7). When Griffin denied knowing why he

was there, Weber told him that he was lying (id., pp. 7-8).[7] Weber then asked him where he was on July 4, and when Griffin replied that he was at a barbeque, Weber told Griffin that he knew he had burglarized a home in Medina (id., p. 8; [269], pp. 30-31).

When Griffin denied this allegation, Weber "pulled out some papers and . . . looked through [them]", and told him that he went to Mr. Marciniak's home and burglarized it ([205], p. 8). Griffin identified Mr. Javier's and Ms. Sauerbier's statements (gov. ex. 7 [299-6]; gov. ex. 5A [299-2]) as being among the documents he observed ([205], pp. 11-13). He continued to deny his involvement (id., p. 8). Weber then told him that Mr. Marciniak had died and "asked me how I felt about that" (id., p. 9). Griffin responded "that it was a bad thing that the man had died", but again denied to Investigator Weber that he was at the home (id.; [269], p. 31). Griffin estimated that he gave Weber false statements for approximately 30 minutes ([269], p. 24).[8]

Griffin testified that Weber then told him that he "had to cooperate now", and that if he did not, "he wouldn't be able to help me out; that it would probably be worse for me in the end" ([205] p. 10).[9] Griffin "still denied it, but then he asked me again about Homer Marciniak. And I told him I felt bad about it" (id., pp. 10-11). Weber then "looked through the papers" and asked him "about how we got there, who went and I proceeded to tell him that . . . I was there,

---

[7]   On cross-examination, defendant testified that Investigator Weber began by asking him pedigree information for "maybe three to five minutes" ([269], pp. 23-24, 30).

[8]   He initially testified that he lied to Investigator Weber for "maybe a half hour, 45 minutes, I don't know" ([269], p. 21).

[9]   He also testified that Investigator Weber told him, "if I talk to him right now, he would do whatever he could for me" ([269], p. 19), however, defendant never asked him what this meant (id., p. 20).

that . . . myself and a couple other people went to the house, that we did burglarize it and that . . . I had hit the guy" (id., p. 11).  His confession came "[n]ot long, maybe another couple minutes" after Weber advised him that he would not be able to help him unless he cooperated ([269], p. 32).

When asked why he gave his statement, Griffin stated that "[i]t was mostly the whole Homer Marciniak aspect of it.  Like I really felt bad about that.  I guess he kind of caught on to that fact.  He asked me and I kind of just told him" ([205], p. 16). Griffin testified that he was not given Miranda warnings until he had already admitted his involvement in the robbery and assault (id., pp. 14, 18-19).

## ANALYSIS

In moving to suppress the statement which he gave on October 28, 2010, Griffin argues that his statement must be suppressed because: (1) "[after he received inculpatory statements . . . [Weber] then Mirandized him at a later time" (Griffin's Memorandum of Law [278], p. 21); (2) "Weber's 'now or never' incantation that he would lose his chance of cooperating with the government unless he confessed immediately was coercive" (id., p. 25), and (3) "the record from the hearing is devoid of a showing of probable cause to arrest . . . and take him to police headquarters" (id.).

A.     **Did Griffin Confess Before He Was Mirandized?**

Griffin argues that "by the time Investigator Weber chose to Mirandize [him], the 'cat was out of the bag.' [He] had confessed to the commission of the burglary and striking Mr.

-11-

Marciniak. There was little more left for him to say". Defendant's Memorandum of Law [278], p. 23. However, Griffin did not make this claim in his pre-hearing motion to suppress [124]. At that time, he argued only that "[t]he method of indicating to Mr. Griffin that he had to provide answers to the officers immediately or be deprived of the ability to receive a lighter sentence rendered Mr. Griffin's statements involuntarily [*sic*] and thus, the statements were not knowingly provided to the officers." Id., ¶16.

Therefore, this argument "should not even be considered, since it was not raised in defendant's pre-hearing motion . . . . 'Just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress.'" United States v. Goodby, 2012 WL 4061215, *4 (W.D.N.Y. 2012) (McCarthy, M.J.), adopted, 2012 WL 4061085 (Arcara, J.) (*quoting* United States v. Restrepo–Rua, 815 F.2d 1327, 1329 (9th Cir.1987)).

In any event, the absence of timely Miranda warnings is so fundamental a basis for suppression that I cannot believe that this claim would have been omitted from Griffin's initial motion if it were true - particularly since the motion was filed by an experienced attorney who had "spoken with Mr. Griffin relative to the statements which have been attributed to him" ([124], ¶13). For this reason, together with my overall assessment of Investigator Weber's credibility, I find that he administered Miranda warnings to Griffin before any inculpatory statements were obtained.

### B.     Was Griffin's Statement Coerced?

"A confession is admissible under the Constitution only if it is made voluntarily." United States v. Orlandez-Gamboa, 320 F.3d 328, 332 (2d Cir. 2003). "The government bears the burden of demonstrating that the defendant's statements were voluntary." United States v. Siddiqui, 699 F.3d 690, 707 (2d Cir. 2012). This requires evaluation of the "totality of the circumstances in which [the statements] were given to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" United States v. Kaba, 999 F.2d 47, 51 (2d Cir.), cert. denied, 510 U.S. 1003 (1993). Relevant factors include: "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997).

Griffin claims that Weber told him " that I had to cooperate now, like if I didn't tell him at that moment . . . that he wouldn't be able to help me out; that it would probably be worse for me in the end". January 25, 2012 hearing transcript [205], p. 10. He argues that "Investigator Weber's 'now or never' incantation that he would lose his chance of cooperating with the government unless he confessed immediately was coercive." Griffin's Memorandum of Law [278], p. 25.

However, even if Weber's statement could be considered coercive, the record makes clear that Griffin was *not* coerced. In his own words, "after he told me I had to talk to him now, I *still denied it*". January 25, 2012 hearing transcript [205], pp. 10-11 (emphasis added).

-13-

When asked "why it was after you had initially not told him the truth, [you] then told him the truth?", Griffin responded "It was mostly the whole Homer Marciniak aspect of it. Like I really felt bad about that. I guess he kind of caught on to that fact. He asked me and I just kind of told him" (id., p. 16).

Moreover, when asked "Has anyone made any threats or promises to you regarding making this statement?", Griffin responded "no". Ex. G3 [299-1], p. 2 of 6. Therefore, I conclude that Griffin's statement was not coerced.

### C.     Was There Probable Cause To Take Griffin Into Custody?

Griffin's final argument, namely that police lacked probable cause to arrest and take him to police headquarters, should likewise not be considered, since it was not raised in his original motion. Goodby, supra. In any event, it lacks merit.

"Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." United States v. Candelario, 2012 WL 2436463, *1 (2d Cir. 2012) (Summary Order). "An admission against penal interest . . . is a significant, and sometimes conclusive, reason for crediting the statements of an informant." Armour v. Salisbury, 492 F.2d 1032, 1035 (6th Cir. 1974).

The government argues that "the statements given by Trish Sauerbier, Arlene Combs, Terry Stewart and Juan Javier provided investigators with overwhelming evidence that Griffin had participated in the Marciniak home invasion robbery. This, in turn, provided more-

than-ample probable cause for the investigators to take Griffin into custody on October 28, 2010". Government's Memorandum of Points and Authorities [277], p. 6), and(id.). I agree.

Griffin argues that "the statements offered by the government of the other individuals does [*sic*] not satisfy any reliability tests" since they "do not amount to statements against the individuals' penal interest because the circumstances of the taking and giving the statements were not shown" and are inconsistent. Griffin's Memorandum of Law [278], p. 26. Nothing in the inculpatory statements of Trisha Sauerbier (gov. ex. 5C [299-4]), Terry Stewart (gov. ex. 6 [299-5]) and Juan Javier (gov. ex. 7 [299-6]) suggests that they were unreliable. Therefore, Weber was entitled to rely on theses statements, even tough they were taken by other officers. "When assessing probable cause to arrest, police officers are . . . entitled to rely - as long as such reliance is reasonable - on information provided by other law enforcement officials". Hewitt v. City of New York, 2012 WL 4503277, *4 (E.D.N.Y. 2012). Moreover, Weber also personally took the inculpatory statement of Arlene Combs (gov. ex. 8 [299-7]), and was able to assess her reliability.

Griffin also seems to suggest that Weber could not have relied on these statements since they do not fall within the hearsay exception for statements against interest (Fed. R. Evid. 804(b)(3)), arguing that "the statements did not show that the statements were believed by the individuals to expose them to criminal liability". Griffin's Memorandum of Law [278], p. 26. However, "[i]t is appropriate for a law enforcement officer to rely on hearsay evidence to support a finding of probable cause." Arias v. United States, 2011 WL 1332190, *3 (S.D.N.Y. 2011). Although Griffin notes that his name does not specifically appear in the statements (Griffin's Post-Hearing Memorandum of Law [278], p. 26), the statements repeatedly refer to an individual

by the name of "Pooh" who participated in the home invasion robbery (gov. exs. 5C [299-4], 6 [299-5], 7 [299-6] and 8 [299-7]), and that is Griffin's nickname. January 25, 2012 hearing transcript [221], p. 47; Second Superseding Indictment [208].

Since these inculpatory statements uniformly corroborate Griffin's involvement in the crime, I conclude that Investigator Weber had probable cause to arrest him on October 28, 2010.

### CONCLUSION

For these reasons, I recommend that defendant Griffin's motion to suppress his October 28, 2010 statements ([124], ¶¶12-17) be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by February 8, 2013 (applying the time frames set forth in (Fed. R. Crim. P. ("Rules") 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of

the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED: January 22, 2013

                                          /s/ Jeremiah J. McCarthy
                                          JEREMIAH J. MCCARTHY
                                          United States Magistrate Judge